UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JACQUELYN VALENTINO, | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
|    vs. | ) CAUSE NO. 1:12-cv-902-WTL-TAB |
| | ) |
| OFFICER JEFF PACKARD, et al., | ) |
| | ) |
|    Defendants. | ) |

## ENTRY ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

This cause is before the Court on Defendants Chris Barbuto, David Starling, and Randy Thorp's (the "Ohio Defendants") motion for summary judgment (dkt. no. 56) as well as Defendants the Kokomo Police Department, Jeff Packard, Brent Wines, Chad Rogers,[1] Shawn Haus, Gray, and Robert Baker's (the "Kokomo Defendants") motion for summary judgment (dkt. no. 57). These motions are fully briefed, and the Court, being duly advised, **GRANTS IN PART AND DENIES IN PART** the motions for the reasons, and to the extent, set forth below.

### I. STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences

---

[1] Ms. Valentino has elected not to pursue her individual claims, both federal and state, against Defendants Packard, Wines, and Rogers. *See* Pl.'s Response at 14, n. 9.

in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II. BACKGROUND

The facts that follow are those taken in the light most favorable to the Plaintiff, Jacquelyn Valentino.

On July 4, 2010, Herchel Roberts was murdered in Licking County, Ohio. Defendant Detectives Barbuto and Starling began an investigation into the murder and soon named Mark Valentino, the Plaintiff's husband at the time, as their main suspect. Barbuto and Starling learned that Mark resided in Kokomo, Indiana, and tracked Mark to Kokomo after the murder via his cell phone. Barbuto and Starling notified the Kokomo Police Department ("KPD") of the need to locate Mark, and both traveled to Kokomo on July 6, 2010.

Pursuant to the information obtained from Barbuto and Starling, KPD Lt. Haus authorized surveillance of Mark's address. Defendant Wines was the first officer to conduct such surveillance. He reported that a 2003 blue Hyundai, believed to belong to Mark, was present at the address, but did not observe anything else. Two and a half hours later, Defendant Rogers relieved Wines and began his surveillance. He contacted Barbuto who informed him that Mark might also be in possession of either a dark brown Chevy Impala[2] or Pontiac Grand Am.[3]

---

[2] The Chevy Impala belonged to a woman with whom Mark was having an affair.
[3] The Grand Am was the car that Ms. Valentino regularly drove, and it was registered to her grandmother.

At approximately 8:15 p.m., Rogers observed a dark-colored Grand Am arrive at the residence. He saw people get out of the car and enter the residence, and then observed Ms. Valentino, another person, and several children get into the Grand Am. Based on this information, Haus reasonably believed that Mark might be in the Grand Am and made the decision to conduct a traffic stop. Haus notified Barbuto and Starling that they were pulling over a car that was suspected to contain Mark and gave them the intersection of the traffic stop.

The Grand Am was stopped by approximately four squad cars, and the occupants were ordered to place their hands in the air. KPD officers approached the car with their guns drawn and discovered that Mark was not present; Gloria Tritt, Mark's former mother-in-law, was the person in the passenger seat, Ms. Valentino was the driver, and Ms. Valentino's three children were in the backseat. Ms. Valentino was ordered to throw the keys out of the car and then to exit the vehicle. She was then ordered to kneel down in the street, whereupon she was handcuffed and placed in the rear seat of a KPD squad car with an officer guarding her to make sure she did not flee. Ms. Tritt was also ordered out of the car and handcuffed; however, her handcuffs were removed approximately one minute after they were put on. Officers then began asking Ms. Valentino about the whereabouts of her husband, Mark. Ms. Valentino repeatedly told the officers that she did not know where her husband was, but they did not believe her and continued questioning her regarding his whereabouts. The officers threatened to tow her car, take her to jail, and call Child Protective Services ("CPS") to take her children away from her if she did not cooperate.

A minute or two after the Grand Am was pulled over, Barbuto and Starling arrived at the scene. Once there, Barbuto also began questioning Ms. Valentino regarding the whereabouts of her husband. Ms. Valentino repeatedly told him that she did not know. Approximately thirty

3

minutes into the questioning, the KPD officer who was guarding Ms. Valentino removed her handcuffs. Ms. Valentino and Barbuto continued their conversation outside. Due to the repeated questioning, at some point during their conversation Ms. Valentino asked Barbuto if she needed a lawyer; he assured her she did not as long as she did nothing wrong.

The questioning continued outside, where, due to the extremely wet summer, there were a lot of mosquitos present. Barbuto asked Ms. Valentino if she would like to continue their conversation downtown to get away from all of the bugs. She was informed that Ms. Tritt could take the car and her children home so Ms. Valentino could accompany the officers to the police station. Ms. Valentino responded that she preferred to go with her children; however, Barbuto assured her that she was going to be questioned more—whether that was outside with the bugs or downtown. Ms. Valentino thus accompanied Barbuto and other officers to the police station in a KPD squad car. Ms. Tritt drove Ms. Valentino's car, with her three children inside, to her home.

Once at the police station, Ms. Valentino's personal belongings were taken from her and she was led into an interview room, where she was questioned by Barbuto. Barbuto assured Ms. Valentino that she was not under arrest and that she did not have to talk with him. During their discussion, Ms. Valentino informed Barbuto that she had been communicating via text messages with Mark that day. Barbuto thus asked Ms. Valentino if she would consent to a search of her cell phone so he could read those text messages, but she declined. Ms. Valentino inquired about her potential culpability as an accessory to the murder due to her communications with Mark, but Barbuto again assured her that she was not under arrest. Later in the interview, Ms. Valentino agreed to the search of her cell phone and signed the consent form.

About halfway through the interview, Starling entered the room and introduced himself to Ms. Valentino. The three of them reviewed her text messages with Mark and engaged Mark

in a new conversation, hiding the fact that Ms. Valentino was working with the police. They set up a rendezvous whereby Mark would meet Ms. Valentino and the police would intervene to capture him.

Haus arranged for Ms. Valentino to be transported back to her car. She then drove, albeit escorted by police, to the meet-location; however, police encountered Mark en route before he met Ms. Valentino. A high-speed chase ensued, and Mark was arrested by KPD officers. After Mark was successfully apprehended, Ms. Valentino requested to go home; however, she was informed that she needed to go back to the police station to ensure Barbuto and Starling were through questioning her. Once she arrived back at the police station, she was informed that she was free to go at approximately 1:00 a.m. on July 7, 2010. Ms. Valentino requested that her cell phone be returned to her; however, the officers informed her that they needed to keep it in order to retrieve the information from it. Ms. Valentino's cell phone was never returned.

Mark was subsequently charged and convicted of numerous counts and sentenced to twenty-three years to life in prison. Ms. Valentino was never charged with any crime. Ms. Valentino subsequently sued the KPD on February 25, 2011, in Howard County Superior Court. She amended her complaint on June 11, 2012, adding additional Defendants and federal claims. The Defendants properly removed the case to this Court on July 2, 2012.

### III. DISCUSSION

In her amended complaint, Ms. Valentino brings the following counts against the Defendants: 1) a section 1983 claim for violations of the Fourth Amendment[4] against the Kokomo and Ohio Defendants; 2) a section 1983 claim for conspiracy by the Kokomo and Ohio

---

[4] Ms. Valentino has decided not to pursue her constitutional claims under the Fifth and Fourteenth Amendments as alleged in Count I of her amended complaint. *See* Pl.'s Response at 14, n. 9.

Defendants; 3) an Indiana claim for false arrest/imprisonment against the Kokomo and Ohio Defendants; 4) a respondeat superior claim against Defendants Baker and the KPD; and 5) a negligent training and supervision claim against Defendant Baker.[5] The Defendants move for summary judgment on all counts. Their arguments will be addressed, in turn, below.

### A. Fourth Amendment Claim Against the Ohio and Kokomo Defendants

In Count I of her complaint, Ms. Valentino brings a section 1983 claim against the Ohio and Kokomo Defendants for violating her Fourth Amendment rights. Specifically, she alleges that the "stopping, detaining, interrogating and transporting Valentino to the KPD headquarters constituted an arrest"[6] for which the Defendants had no warrant or probable cause. Pl.'s Complaint at 5. The Defendants claim they are entitled to qualified immunity on Ms. Valentino's Fourth Amendment claim.

Qualified immunity involves a two-part inquiry. The Court must determine whether the facts that Ms. Valentino has alleged make out a constitutional violation. If there was a constitutional violation, then the Court queries whether the right violated by the Defendants was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Pearson v. Callahan*, 555 U.S. 223, 232 (2009). In short, "[q]ualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Pearson*, 555 U.S. at 232. In *Pearson,* the Supreme Court held that judges "should be permitted to exercise their sound discretion in

---

[5] Ms. Valentino has elected not to pursue her official capacity constitutional claims against Defendants Baker and Thorp as alleged in Counts IV and V of her amended complaint. *See* Pl.'s Response at 14, n. 9. She also voluntarily dismissed her claim of a public records violation as alleged in Count X of her amended complaint. *See* Kokomo Defs.' Brief at 8.

[6] For the purpose of its analysis, the Court will refer to Ms. Valentino's Fourth Amendment claim as one for an unlawful seizure. *See Gonzalez v. Vill. of W. Milwaukee*, 971 F.3d 649, 655 (7th Cir. 2012) ("'False arrest' is shorthand for an unreasonable seizure prohibited by the Fourth Amendment.").

6

deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. In the instant case, the Court believes that it is most appropriate to begin with the first inquiry—did the Ohio and Kokomo Defendants violate Ms. Valentino's Fourth Amendment right to be free from unlawful seizure?

While Ms. Valentino alleges that the "events of July 6, 2010, are not two *separate* events, but constitute a single, unlawful seizure of Valentino lasting approximately four and a half hours[,]" Pl.'s Response at 16, the Court believes it is appropriate to analyze the night's events in order—beginning first with the initial traffic stop and proceeding to Ms. Valentino's transportation to the KPD headquarters and her continued interrogation once there. This way, the Court can accurately analyze whether Ms. Valentino remained unlawfully "seized" for the purposes of the Fourth Amendment for the entire four and a half hours.

*1. Violation of Fourth Amendment Right: The Traffic Stop*

Before the Court analyzes whether the traffic stop constituted an unlawful seizure, Barbuto and Starling argue that they are entitled to summary judgment because they were not personally involved in alleged unconstitutional acts during the traffic stop. Barbuto and Starling are correct that in order for § 1983 liability to attach, they have to be found personally responsible for Ms. Valentino's constitutional deprivations. *See Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 614 (7th Cir. 2002) ("It is well-established that a plaintiff only may bring a § 1983 claim against those individuals personally responsible for the constitutional deprivation."). They argue that they arrived to the scene after the stop had already been completed and Ms. Valentino was in handcuffs, and it was KPD officers who did most of the questioning and managed the scene.

7

The Court finds that Ms. Valentino has alleged sufficient facts alleging that Barbuto was personally involved in her alleged Fourth Amendment violation at the traffic stop. She states that Barbuto questioned her at the scene, and that it was his idea to continue their conversation at the police station—this is sufficient, despite Barbuto's argument to the contrary, to find Barbuto to be personally involved with respect to section 1983 liability. The same cannot be said, however, with regard to Starling's participation at the traffic stop. Ms. Valentino has failed to allege that Starling played any role in the initial traffic stop. *See* Pl.'s Dep. at 68: 21-22 ("I didn't hear a whole lot from Mr. Starling until we were downtown."); *see also id*. at 230: 6-7 ("My interaction with him [Starling] was actually quite brief and limited that evening."). At the summary judgment phase, Ms. Valentino needed to "show what evidence [she] has that would convince a trier of fact to accept [her] version of events." *Johnson v. Cambridge*, 325 F.3d 892, 901 (7th Cir. 2003) (quoting *Schact v. Wisconsin Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999) (internal quotations omitted)).[7] Accordingly, the Court finds that Starling cannot be liable for any unconstitutional acts during the traffic stop, but will address his participation in the questioning at the KPD headquarters below.

Turning now to the traffic stop, Ms. Valentino concedes that her initial seizure by the KPD officers was lawful pursuant to *Terry v. Ohio*, 392 U.S. 1, 16 (1968), which allows officers to conduce investigatory stops when they "can 'point to specific and articulable facts which,

---

[7] Ms. Valentino incorrectly states that because "Starling proffers no evidence to suggest that his participation was incidental, the Court must draw the inference most favorable to Valentino, *i.e.*, that Starling *did* actively participate." Pl.'s Response at 19. First, Starling does argue that his involvement in the traffic stop does not meet the personal involvement standard under section 1983. Further, Ms. Valentino has produced no evidence suggesting Starling had any involvement other than being present at the scene. At the summary judgment phase, Ms. Valentino needed to allege sufficient facts such that a reasonable juror could find in her favor. She has failed to do so with respect to Starling's involvement in the traffic stop.

taken together with the rational inferences from those facts, reasonably warrant an intrusion.'" *Cady v. Sheahan*, 467 F.3d 1057, 1062 (7th Cir. 2006) (quoting *Terry*, 392 U.S. at 21). However, she argues that "KPD's initial, reasonable and justified *Terry* stop became a *de facto* arrest when the Defendants (both Ohio and KPD) continued to hold Valentino in custody, long after they had achieved the stated objectives of the stop." Pl.'s Response at 28. The Defendants were justified in her initial seizure because they reasonably believed Mark might be in the car and/or that evidence of the murder might be found in the car. Once the Defendants achieved their stated purposes, Ms. Valentino argues, the *Terry* stop should have ended.

A *Terry* stop "must be reasonably related in scope and duration to the circumstances that justified the stop in the first instance so that it is a minimal intrusion on the individual's Fourth Amendment interests." *United States v. Bullock*, 632 F.3d 1004, 1015 (7th Cir. 2011) (quoting *United States v. Robinson*, 30 F.3d 774, 784 (7th Cir. 1994)). A detention goes beyond the permissible scope of a *Terry* stop if the officers' actions amount to a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994); *see also Bullock*, 632 F.3d at 1015 (stating that if a *Terry* stop exceeds its proper scope by continuing too long or becoming unreasonably intrusive it "can ripen into a de facto arrest"). Therefore, the Court must determine whether additional actions and a continued detention were reasonably related to the circumstances that justified stopping Ms. Valentino's car in the first place. *See Bullock*, 632 F.3d at 1015 (noting that a court should consider "the law enforcement purposes to be served by the stop, the time reasonably needed to effectuate those purposes, and whether the police diligently pursued their investigation" in determining the reasonableness of the stop).

9

The Court agrees with the Defendants that it was permissible, pursuant to their lawful *Terry* stop, to order Ms. Valentino out of the car, order her to the ground, and even briefly handcuff her to perform a protective search to ensure she had no weapons—the officers reasonably believed the weapons Mark stole from Ohio might have been in the car. Further, the Court believes that it was permissible to conduct a brief interview with Ms. Valentino, as she was the wife of a murder suspect—questioning who she was, if she knew where Mark was, when she last spoke to him, and what he said to her were all questions within the bounds of the investigation the officers were conducting when they performed their lawful *Terry* stop. All of these questions were reasonably related to the initial stop's purpose: locating Mark. However, this is where the Court parts ways with the Defendants. In detaining and repeatedly questioning Ms. Valentino for forty-five minutes, the Court finds that the officers went beyond the permissible scope of their lawful *Terry* stop.

It was clear from the moment Ms. Valentino and Ms. Tritt exited the car that Mark was not present, as Ms. Tritt was the only adult passenger in the car who was unknown[8] and suspected to be Mark. The officers had no evidence linking Ms. Valentino to the murder in Ohio—she was not a suspect. Further, Ms. Valentino was not a danger to the officers—they frisked her and found no weapons or contraband on her person. It is questionable, therefore, why the officers felt the need to detain Ms. Valentino in handcuffs, in the back of a squad car, guarded by a KPD officer for approximately thirty minutes. This is compounded by the fact that Ms. Tritt's handcuffs were removed almost immediately after they were put on. *See* Tritt Dep. at 85:19-86:5 (stating she was probably only in the handcuffs for a minute). Ms. Tritt was allowed

---

[8] In observing the people get into the Grant Am, the officers did not know whether Ms. Tritt was male or female and thus suspected she could have been Mark.

to remain outside the Grand Am, close to the children, with no restraints while she was questioned by the officers.

Ms. Valentino noted that the officer guarding her while she was detained in the car finally removed her handcuffs:

> The officer posted to stand watch on me kept motioning to the Ohio detectives and his superior officers asking if he could take me out of the cuffs. They were looking right at him and would deliberately turn around the other direction, at which point the officer actually looked at me semi-unprofessionally but, hey, I was thankful and said, "Fuck it. Stand up. I'm making an executive decision." And he took my cuffs off because he said, "Because obviously you're not running anywhere."

Pl.'s Dep. at 67: 1-11. Ms. Valentino was cooperative with the police, she was responsive to their questioning, and did not resist or attempt to flee from the officers. Once the officers realized Ms. Valentino was not a danger or a threat, there was no need to keep her handcuffed and detained in the back of a squad car. The Defendants make much about the fact that Ms. Valentino's handcuffs were eventually removed whereupon she was allowed to exit the squad car. However, this ignores the fact that this occurred just prior to her transportation downtown, and that while unrestrained Ms. Valentino alleges "[t]he officers were flanking [her] sides pretty much the whole time." *Id*. at 72: 16-17. This cuts against any argument by the Defendants that Ms. Valentino's seizure ended once she was allowed to leave the squad car and her handcuffs were removed.

Further, the repeated questioning was unnecessary and extended the length of her detainment beyond the permissible bounds of *Terry*. *See id*. at 64: 12-15 ("[O]ne person would ask me a few more questions and then somebody else would come back and ask me the same questions and I still didn't have the answer they wanted."). It is obvious that the officers, without any proof, thought Ms. Valentino was not being truthful:

> And I had to answer that same question [When was the last time you saw Mark?] probably three times over before at some point that officer looked at me and said, "Are you lying to me right now? Is there anything you're lying to me about?" At which point Lieutenant Haus walked up and said, "Yeah, she is. Everything she's saying is. She's full of shit."

*Id*. 60: 5-11. Ms. Valentino was truthful with the officers that she did not know where Mark was. She told them all she knew—that she had been with him that morning and he had been texting her during the day. The officers also threatened Ms. Valentino, perhaps thinking that would make her become more forthcoming. *See id*. at 61: 15-17 ("Lieutenant Haus looked at me and said, "Do you realize I could take your children and take you to jail right now?"). Being subjected to repeated, harassing questions—when she was not suspected of committing any crime—as well as being threatened was certainly not within the scope of the permissible *Terry* stop in this instance. Once the officers realized Mark was not in the car and obtained the information from Ms. Valentino regarding her husband—even if it was not the information they hoped for—pursuant to *Terry*, the stop should have ended, and Ms. Valentino should have been permitted to leave. A reasonable jury could find that Ms. Valentino's Forth Amendment rights were violated by the officers' actions in repeatedly questioning her, handcuffed, in the back of a squad car, guarded by a KPD officer for thirty minutes.

### 2. *Violation of Fourth Amendment Right: Ms. Valentino's Transportation to the KPD Headquarters*

Rather than being allowed to leave with her children, Ms. Valentino was placed, again, in the back of a squad car and transported to the police station. *See id*. at 93:14-16 ("I asked at one point if I could take my own car . . . and I was told no."). The Defendants paint this encounter as "voluntary"; however, viewing the facts in the light most favorable to Ms. Valentino, a reasonable jury could find otherwise. As Ms. Valentino recalls:

12

> [A]t some point someone looked at me and said, 'Is it okay if Gloria takes your car and your kids to her house because we're going downtown.' [I said,] I'd kind of rather be going with them if it's all the same to you. I mean, I don't have the information you want, where is Mark? [The officer replied,] Yeah. Well, that's not going to happen.

*Id*. at 68: 6-14. She alleges that Barbuto told her, "whether we have the discussion here or we're going downtown, you're still stuck. We're staying here and talking. Either we can go down there and be away from the bugs or we can sit here and do it but we're still doing this."[9] *Id.* at 78: 17-21. As Ms. Valentino stated, "the whole situation did not break down to free choice." *Id*. at 91: 1. Essentially, Ms. Valentino's "choice" was either: 1) cooperate with the police and go downtown; or 2) be taken to jail, have her car towed, and have CPS called for her children. A reasonable jury, viewing the facts in the light most favorable to the Plaintiff, could find that Ms. Valentino's decision to go to the police station was not voluntary, and that her seizure continued as she was transported to the KPD headquarters.

### 3. *Violation of Fourth Amendment Right: Ms. Valentino's Interview at the KPD Headquarters*

It is a closer question as to whether Ms. Valentino's seizure continued during her interview with Barbuto and Starling at the police station. "So long as a reasonable person would feel free 'to disregard the police and go about his business' the encounter is consensual" and no seizure has occurred. *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)). Only when "taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business'" is the individual seized for Fourth Amendment purposes. *Id.* at 437 (quoting *Michigan v. Chesternut*,

---

[9] The Court notes that Barbuto may not have exactly said these words, as Ms. Valentino does not recall specifically what he said. Nevertheless, she stated that these words conveyed the "general idea" of what Barbuto said.

486 U.S. 567, 569 (1988)). "Factors relevant to this determination include 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *United States v. Packer*, 15 F.3d 654, 657 (7th Cir. 1994) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554-55 (1980)). Courts have also considered "whether the encounter occurred in a public or private place; whether the suspect consented to talk with the law enforcement agents; whether the agents informed the suspect that he was not under arrest and was free to leave; [and] whether the agents removed the suspect to another area." *United States v. Adebayo*, 985 F.2d 1333, 1338 (7th Cir. 1993).

Once Ms. Valentino arrived at the KPD headquarters, she was placed in a locked, according to Ms. Valentino, interrogation room and questioned by Barbuto and Starling. Both were wearing plain clothes, and neither brandished any weapons. At the start of the interview, Barbuto termed the interview as "voluntary" and, again, assured Ms. Valentino that she was not under arrest. Ms. Valentino was allowed to leave the restroom, although there were officers who stood outside the door to ensure she did not leave. Ms. Valentino was not handcuffed during the interview, nor was she physically touched in any way. Ms. Valentino was deprived of the use of her car, as she was not permitted to drive herself to the KPD headquarters, as well as her other personal belongings. When she was finally taken to her own car to help the police with their set-up to capture Mark, she was tailed by officers the entire way to the rendezvous location. Once Mark was finally captured, she still was not allowed to leave, but rather, had to accompany the officers back to the KPD headquarters where, finally, at 1:00 a.m. she was permitted to leave.

Viewing the evidence in the light most favorable to Ms. Valentino, the Court believes that a reasonable jury could find that Ms. Valentino remained seized throughout the entire

14

interview. Along with the details cited above, Ms. Valentino had been threatened with the loss of her children if she didn't cooperate—it is evident from the video of the interview that she was concerned about her children. *See* Dkt. No. 55 at 34: 6-7 ("Like I said, my only goal is to get out of here as soon as possible and get to my children."); *see also* Pl.'s Dep. at 97: 20 (stating that before she got to the interrogation room she "had been threatened and intimidated unimaginably"). The Court finds that a jury could conclude that a reasonable person in Ms. Valentino's shoes would not have felt free to leave the interrogation room, disregard the officers' questions and demands, and go about her business.

While the Defendants make much ado about the fact that she never asked if she could leave, it is questionable how, even if she did ask, Ms. Valentino would have thought she was allowed to leave as she did not have any of her personal belongings nor her car. Even when Ms. Valentino asked for her purse so she could obtain her chapstick, her purse was not returned to her; officers went through her purse, found the chapstick, and then brought only that to her. *See* dkt. no. 60 at 55:30-57:10. Further, while the Defendants are correct that Barbuto did term the interview as "voluntary," this is merely one factor in analyzing whether a person was seized for the purposes of the Fourth Amendment. In fact, Ms. Valentino questioned the "voluntariness" of the interview from the start stating, "[r]ealistically, you guys have personal – my personal belongings and can search them, even though everyone is stating that I'm not under suspicion." Ohio Defs.' Brief at 7. At the summary judgment phase, the Court finds that Ms. Valentino has alleged sufficient facts such that a reasonable jury could conclude she was unlawfully seized for the duration of her interactions with the police on July 6-7, 2010.

*4. Clearly Established Right*

Finding that a reasonable jury could find that Ms. Valentino's constitutional rights were violated, the Court proceeds to the second step in the qualified immunity analysis. In order to meet her burden, Ms. Valentino can show either a "clearly analogous case establishing a right to be free from the specific conduct at issue" or "conduct [that] is so egregious that no reasonable person could have believed that it would not violate clearly established rights." *Chelios v. Heavener*, 520 F.3d 678, 691 (7th Cir. 2008). Here, the Court believes that Ms. Valentino has met her burden. Ms. Valentino was handcuffed and placed in the back of a squad car guarded by a KPD officer for thirty minutes while she was repeatedly asked the same questions regarding Mark. Unsatisfied with her answers, her veracity was questioned and she was threatened with being taken to jail and the loss of her children. She was then told that instead of being allowed to leave with her children and Ms. Tritt, she had to continue being questioned by officers downtown. She was taken to the KPD headquarters in a KPD squad car and further questioned in a locked interrogation room. Even after she fully cooperated with the officers and Mark was captured, she was still not allowed to leave, but rather had to go back downtown to ensure the officers were "done with" her. The Court believes that viewing the facts in the light most favorable to Ms. Valentino, a jury could find that no reasonable officer would believe a seizure under these facts was lawful. Accordingly, a finding of qualified immunity is precluded, and the Court will not grant summary judgment on that ground.

**B. Section 1983 Conspiracy Claim Against the Ohio and Kokomo Defendants**

In Count II of her complaint, Ms. Valentino brings a section 1983 conspiracy claim against the Kokomo and Ohio Defendants, alleging that they agreed to unlawfully arrest her and confine her in a police vehicle without a valid warrant or probable cause. "[T]o establish a prima facie case of a civil conspiracy, a plaintiff must show (1) an express or implied agreement among

16

defendants to deprive plaintiff of his or her constitutional rights and (2) actual deprivations of those rights in the form of overt acts in furtherance of the agreement." *Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988). All Defendants argue that there is no evidence that any of them agreed to violate Ms. Valentino's rights. Ms. Valentino has not produced any evidence of this agreement, and as such, summary judgment is **GRANTED** as to all Defendants on Count II of her complaint. *See Johnson*, 325 F.3d at 901 ("As we have said before, summary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.") (quoting *Schact*, 175 F.3d at 504 (internal quotations omitted)).

### C. False Arrest/Imprisonment Claims Against the Kokomo and Ohio Defendants

Counts VI and VII are brought against the Kokomo and Ohio Defendants respectively for false arrest/imprisonment in violation of Indiana law. "[F]alse imprisonment is defined as the unlawful restraint upon one's freedom of movement or the deprivation of one's liberty without consent." *Earles v. Perkins,* 788 N.E.2d 1260, 1265 (Ind. Ct. App. 2003). Based on the above analysis, the Court does not believe summary judgment is warranted on Ms. Valentino's false arrest claims. Viewing the facts in the light most favorable to Ms. Valentino, a reasonable jury could find that the actions taken by the Defendants during the initial traffic stop and those taken during her transportation to and interrogation at the KPD headquarters restrained her freedom of movement. Accordingly, summary judgment is **DENIED** on Ms. Valentino's false arrest/imprisonment claims.

### D. Respondeat Superior Claim Against Defendants Baker and the KPD

Count VIII is brought against Defendants Baker, Chief of the KPD, and the KPD under a theory of respondeat superior. "Under the doctrine of respondeat superior, an employer is liable for the acts of its employees which were committed within the course and scope of their employment." *City of Fort Wayne v. Moore*, 706 N.E.2d 604, 607 (Ind. Ct. App. 1999). Defendants Baker and the KPD simply argue that Ms. Valentino cited nothing to support her claim; however, the Court does not agree. Ms. Valentino alleges that "[i]t is undisputed that the KPD Defendants were acting within the scope of their employment. Thus, if they falsely arrested and/or imprisoned Valentino, it is the employer, the Kokomo Police Department, that is liable for those tortious acts." Pl.'s Response at 32. The Court agrees. Because summary judgment was denied on Ms. Valentino's claim for false arrest/imprisonment, the Court cannot grant summary judgment on her respondeat superior claim.

### E. Negligent Training and Supervision Claim Against Defendant Baker

Finally, Ms. Valentino alleges in Count IX of her complaint that Defendant Baker is liable for negligently training and/or supervising the KPD officers. Defendant Baker argues he is entitled to summary judgment as Ms. Valentino has alleged no facts to support this claim. The Court agrees. She has offered no evidence that this incident resulted from a failure to train or supervise on the part of Defendant Baker other than what was alleged in her amended complaint—that Baker breached a duty owed to Ms. Valentino by failing to train and supervise the KPD officers. Again, at the summary judgment phase, Ms. Valentino needed to allege sufficient facts such that it would be reasonable for a jury to find in her favor. She has failed to do so. Accordingly, summary judgment on Count IX of her complaint is **GRANTED** as to Defendant Baker.

### IV. CONCLUSION

For the foregoing reasons, Defendants Chris Barbuto, David Starling, and Randy Thorp's motion for summary judgment (dkt. no. 56) as well as Defendants Gray, Shawn Haus, the Kokomo Police Department, Jeff Packard, Chad Rogers, and Brent Wines' motion for summary judgment (dkt. no. 57) are **GRANTED IN PART AND DENIED IN PART**.

SO ORDERED: 01/27/2014

*William T. Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication